**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

In the Matter of Minnetonka Public Schools,
Independent School District No. 276,                     Civil File No. _____

                                    Plaintiff,            **COMPLAINT PURSUANT TO 20 U.S.C.**
                                                          **§ 1415(i)(2)**

v.

M.L.K., by and through his Parents,
S.K. and D.K.

                                    Defendants.

---

        Minnetonka Public Schools, Independent School District No. 276, brings this Complaint

pursuant to the Individuals with Disabilities Education Act ("IDEA") challenging an

Administrative Law Judge's ("ALJ") Interim Order on the statute of limitations under IDEA[1]

and challenging the Findings of Fact, Conclusions of Law, Recommendation and Order [2] of the

ALJ in the state level special education due process hearing.

**I.      Jurisdiction and Venue.**

        This case arises under the federal Individuals with Disabilities Education Act ("IDEA")

and corresponding Minnesota law.  *See* 20 U.S.C. § 1415(i)(2); Minn. Stat. § 125A.091, subd.

24.

        1. This Court has jurisdiction over this action pursuant to 20 U.S.C. § 1415(i)(2) and 28

           U.S.C. § 1331.

---

[1] Exhibit 1- Interim Order on Statute of Limitations dated October 31, 2019.
[2] Exhibit 2 – Findings of Fact, Conclusions of Law, Recommendation and Order dated January 30, 2020 (hereinafter "Decision").

2. Venue in this district is authorized by 28 U.S.C. § 1391(b) because the defendants are residents of the State and reside within this Judicial District, and the events giving rise to the Complaint occurred within this Judicial District.

## II.   Parties.

3. Plaintiff Minnetonka Public Schools, Independent School District No. 276, ("Minnetonka" or "District") is a public-school district in Minnesota.

4. The District, under the management and control of its duly elected Board of Directors, governs the public schools situated within District boundaries.  The District's principle office is located at 5621 County Road 101, Minnetonka, Minnesota 55345.

5. S.K. and D.K. ("Parents") are the parents of M.L.K. ("Student" or "M.L.K.").  S.K., D.K., and M.L.K. reside in Excelsior, Minnesota.  The District is M.L.K.'s resident school district.

6. The Parents requested a due process hearing on August 9, 2019 alleging that the District failed to provide the Student with appropriate reading instruction from Kindergarten to grade four including a failure to use the Wilson Reading System in grade two. The District did use the Wilson Reading System curriculum with the Student beginning mid-year of his third-grade year.

7. The Wilson Reading System is referred to in the hearing record as WRS or Wilson Intensive.

8. Wilson Reading System is a reading curriculum that its authors suggest is appropriate for students grades two and up. It is a multi-sensory, sequential, explicit reading program designed to teach reading to students with learning disabilities including dyslexia.

9. Minnetonka Public Schools is the only school district in Minnesota to have trained its staff in the Wilson Reading System.

10. The District also has trained teachers at Minnewashta Elementary in similar research based, multi-sensory, sequential, explicit reading curriculums including the Sonday System and a pre-Sonday program called "Let's Play Learn".

11. The District also has trained teachers at Minnewashta Elementary in Fundations. Fundations is a Wilson Reading Program that may be used as a Tier I or II intervention for general education students who need additional support in phonics and decoding. Fundations may also be used as a general education reading curriculum.

12. The District uses a response to intervention system for reading instruction.  Students in the general education classroom receive reading (language arts) instruction. For those students who exhibit difficulty learning to read, the District employs Tier I interventions in the general education classroom provided by the general education teacher. Tier II interventions are provided in a small group four times per week. Tier III interventions are provided by a reading teacher in a one to one or one to two teacher/student ratio.

13. Students may receive Tier I – III interventions in reading as well as receive special education instruction in reading.

14. In the 2016-2017 school year, the District was in the practicum phase of training select teachers and paraprofessionals in the Wilson Reading System. Each teacher had one hand selected student who met the Wilson requirements for a teaching model.

## III. Factual Background.

15. **The Student.** The Student had completed grade three at the District's Minnewashta Elementary School when his parents requested a due process hearing on August 9, 2019.

3

16. According to their records, the Parents first requested Wilson Reading System as their son's curriculum in August of 2018. The District denied their request.

17. The Student has severe dyslexia (a language-based learning disability in reading), significant Attention Deficit Hyperactivity Disorder ("ADHD") and mild Autism Spectrum Disorder ("ASD").

18. **RSK.** In the 2014-2015 school year, the Student attended Ready Set Kindergarten ("RSK"). RSK is a program unique to the Minnetonka Public Schools.  It is a full day kindergarten program for students who are of kindergarten age but are not ready for a traditional kindergarten program. Students can move to grade 1 following RSK or their parents may choose to have them continue with a second year of kindergarten.

19. The Minnetonka School District has a strong literacy program with a block of reading instruction daily  for elementary students. The Fountas and Pinnell Assessment System is the bench marking tool that is used for assessing the reading needs and progress for general education students. It is one of many literacy tools the District employs with young students.

20. In addition to the general education instruction, the  District also employed a research-based, multi-sensory, systematic reading intervention called the Sonday System to instruct the Student.  It was provided as one to one instruction by a general education teacher to provide the Student  with added support with phonics and basic reading skills.

21. The Student also received daily support in reading from a paraprofessional.

22.  At the end of his RSK year, his teacher stated that he had made behavioral and learning progress, but it was not the expected progress given the level of intervention in place.

23. **Spring 2015 Evaluation**. As a result, Student was evaluated for special education services and his Individualized Education Program ("IEP") team (necessarily including his parents as required by IDEA) found him eligible for special education services under the criteria for Autism Spectrum Disorder ("ASD").

24. The evaluation identified that the Student had average cognitive ability. He obtained a standard score of 98 in the 45th percentile of similarly aged peers.

25. The evaluation also determined that the Student scored below average in reading (standard score of 70), written language (standard score of 50) and math (standard score of 71)

26. The evaluation specifically identified needs in academic skills including "phonics, decoding, written expression and spelling, math skills and math concepts."

27. The evaluation reviewed the Student's private speech language providers assessment of his language abilities including delayed syntax, pronoun confusion, delayed verb phrases and "the main language concern of delayed phonemic awareness".

28. The Student received private speech therapy beginning in pre-school from the Madison Center. The record reflects that the Madison Center focused its services on the Student's delayed phonemic awareness.

29. The evaluation reported that the Student had "significantly elevated scores" for hyperactivity and conduct problems. In addition, staff noted in the report that he demonstrated "a high activity level and tends to fiddle with things, leave his seat frequently, and demonstrates some difficulty controlling his impulses."

30. A functional behavioral assessment ("FBA") was part of this evaluation and it identified that the Student had difficulty maintaining active engagement in learning activities, would move from the group and talk to himself or wander from the classroom. The FBA

identified needs in perspective taking skills, social interaction skills, expected/unexpected behaviors and whole-body listening.

31. Finally, the evaluation identified needs in the areas of attention and focus and fine motor skills such as handwriting

32. The Student's parents participated in this evaluation and received a Notice of Procedural Safeguards.

33. **2015 -2016 IEP for Kindergarten.** The IEP team determined that the Student required direct instruction in  reading, written language and math as well as emotional, social, behavioral development and occupational therapy. The IEP included direct special education instruction in a small group of students in reading, written language and math five days per week for thirty minutes. The Student also received direct instruction in social skills and occupational therapy services.

34. The staff also received indirect consultation services from an ASD specialist.

35. Goal one on the IEP identified that the Student needed to increase his reading skills in the areas of sound/letter correlation and sight word identification. The short-term objectives on that IEP related to reading, including verbally identifying the letters in the alphabet, correlating the sound to the letter and reading sight words.

36. The Student's IEP also included a writing goal and objectives.

37. The IEP included a math goal and objectives.

38. Finally, the IEP also included goals related to social skills, attention and engagement in learning and social communication.

39. **Progress Reporting.** The District provided a written progress report to the Parents three times that school year. Each time the progress reports showed some growth in reading,

written language and math, although the Student was not at grade level despite the District's interventions.

40. The progress reporting included numerical data each time showing the Student's progress and identified that the Student was not yet performing at grade level.

41. The progress reporting indicated progress in social emotional development including keeping his body in the group, thinking with his eyes and following the group plan. He made progress in demonstrating reciprocal communication when in conversation with another person although he did not meet any of the goals.

42. **2016- 2017  IEP for Grade One**. The District convened the IEP team in the spring of 2016 and proposed to increase the Student's special education services to address his academic learning needs. His academic services increased from thirty minutes of special education daily to sixty minutes daily. The new IEP reflected these increased services and the Parents signed the Prior Written Notice of the District's Proposed Action agreeing with the addition of academic services.

43. **Progress Reporting.** There were two written progress reports and one annual IEP team meeting in in this year. (Exh. 10 p.109) The reports show progress in his social skills group. His special education teacher reported that he made "huge strides" in math and in his writing.  She reported that even with one to one instruction and accommodations in reading, "memorizing and storing what he has been introduced to continues to be an area of difficulty for [the Student] because of his attentional issues." Nonetheless, the Student made progress in reading, but the report indicates he was not at grade level. The progress reporting noted the extreme difficulty the Student had with attention and focus. The report indicated that he required reminders about every 1-2 minutes to stay engaged with the

learning tasks. It stated that the Student continued to have difficulty engaging in and carrying on a conversation. And that he continued to need adults prompting him to "think with his eyes" to gain social information about what was taking place around him.

44. The progress reporting provided specific data about the Student's progress including that he had mastered all of the kindergarten high frequency words and it listed those words. The report provided specific information about the Student's pre-reading accomplishments noting that he was able to manipulate sounds and decode CVC (consonant, vowel, consonant) words; he was learning the sounds associated with the letters, and learning to put those sounds together to produce simple CVC words such as zip, pen, and cat.

45. The progress reports similarly provided specific data about the Student's progress in math and social skills.

46. **2017-2018 IEP Grade Two**. In grade two, the IEP reported that the Student made steady progress in handwriting and math. The IEP reflects that phonemic awareness continued to be an area of focus for his instruction. His IEP reflected that he "continues to need support in reading, especially in decoding and fluency." He had a "significant lag behind his peers with phonological processing". The Student also made solid progress in social and emotional arenas. The IEP reported that he continued to need almost constant reminders to attend to a group or an activity.

47. The Student had one to one instruction in reading by teacher Carrie Justinak, a licensed special education teacher.  He also had 40 minutes daily with a second licensed special education teacher in a small group using the Fundations curriculum.

48. The School District recommended a change in special education teachers to have the new teacher employ different strategies with the Student. The Parents objected to removing

Ms. Justinak and so the District assigned two teachers to work with the Student as a compromise.

49. The Parents received two written progress reports and  there was one IEP team meeting where progress was provided. The progress reporting identified that on his goal to increase his ability to perform several phonemic awareness activities reading from a Level B to a Level F in the general education reading curriculum, he made adequate progress. As in prior years, it provided information about the Student's continued needs in all areas.

50. **2018 Re-Evaluation**.  In April 2018, the Student was in second grade and the District re-evaluated the Student in all areas of suspected disability and found the Student continued to be eligible for special education.  The evaluation identified all of the Student's needs including needs in reading and phonics skills, mathematics, writing, speech and language, attention, social skills, and ASD-related needs. The Student's skills in reading, mathematics, and writing were assessed utilizing the Woodcock-Johnson IV Tests of Achievement.  This included phonics skills—including letter sounds—as well as sight words and spelling.

51. This evaluation also determined that the Student qualified for two related services; Developmental Adaptive Physical Education: Special Education ("DAPE") and Speech and Language Services.

52. Each of the Student's IEPs identify his deficits in reading including phonics and decoding. Each of his IEPs addressed those deficits by providing special education instruction using a research based, multi-sensory, sequential reading curriculum while increasing the amount of services and the number of students in the group.

53. All of the expert witnesses – those testifying on behalf of the Parents and the School District experts (District staff and Ms. Campbell), testified that the curriculums were appropriate for this Student.

54. Each of the Student's IEPs identified the need to increase the amount of reading service the Student received in response to his slow progress in reading.

55. Each of his IEPs identified the need to decrease the number of students in his reading group such that he received some one to one instruction in second and third grades.

56. **2018-2019 IEP Grade Three**.  In grade three, the Student  received 40 minutes daily reading with a special education teacher as well as 20-25 additional minutes per day of reading instruction from a second special educator. The latter instruction was one to one. The Student received a total of 60-65 minutes of reading instruction in addition to general education reading instruction.  This was an increase of services and his parents agreed to this increase.

57. At an IEP team meeting on February 7, 2019 progress was reported. The Student had moved from a Level G in the Fountas and Pinnell general education reading program to a Level H  - surpassing his goal of being at Level F by May of 19.

58. The school professionals offered that the Student was working on building his endurance for academic tasks and his focus and engagement and that he would be good candidate for Wilson Reading System in grade 4. His parents disagreed and asked for Wilson Reading System to begin in grade three**.**

59. The District did not initially agree to implement the Wilson Reading System for two reasons. First that the Student was making progress in the Fundations curriculum and

second, he had significant attentional issues that made it difficult for him to engage in learning activities and that interfered with his acquisition of skills.

60. As a result of the Parents' continued request, the District proposed that the Student begin the Wilson Reading System delivered in a small group. He was instructed by a Wilson certified paraprofessional.

61. **Amended IEP.** On February 25, 2019, the IEP team agreed to place the Student in a small group of two other students for instruction in Wilson Reading System delivered by a Wilson certified instructor.

62. The Parents readily agreed and voiced appreciation that the Student could have this change mid-year.

63. The two other students in the reading group were hand selected by the Student's case manager and Principal in order to ensure that they were at the same reading level as the Student**.**

64. When the Parents filed their due process hearing request eight months later, they objected to the fact that the Wilson certified instructor was a paraprofessional.

65. At hearing the Parents withdrew this objection.

66. **Minnesota Department of Education ("MDE").** On March 24, 2019, the Parents filed a complaint with the MDE alleging the Student was denied appropriate reading instruction because he was not instructed in the Wilson Reading System in grade two.

67. The MDE reviewed the Student's education records, interviewed his parents, interviewed his teachers and then issued a decision on May 24, 2019.  The MDE determined that: (1) "the District developed an IEP that appropriately considered the student's academic, developmental, and functional needs; the concerns of the parents for enhancing the

education of their child; and the results of independent educational evaluation obtained by the parents, in accordance with 34 C.F.R. § 300.324(a);" (2) the provision of 65 minutes of daily direct special education services focused on language arts and specialized instruction using a "multi-sensory, research based reading curriculum" in the IEP complied with 34 C.F.R. § 300.320(a)(4); (3) the District's decision to utilize the Fundations curriculum with the Student was in compliance with the Student's IEP and provided the Student a FAPE; and (4) the District's decision to revise the Student's IEP to provide WRS intensive instruction provided "further supports the conclusion that the District considered the Student's needs, the [Parents'] concerns, and the results of the independent educational evaluation." The District was not ordered to take any corrective actions, including providing extended school year services ("ESY").

68. **Groves Academy.** The Parents applied to Groves Academy to place the Student there for fourth grade during the 2019-2020 school year. Groves Academy is a private school that specializes in teaching students with learning disabilities.

69. Groves Academy denied the Student's admittance to Groves Academy because Groves Academy staff "observed a lack of engagement, both socially and academically," that would interfere with his learning at Groves Academy and required a different kind of support than Groves Academy could provide.

70. The District  has contracted with Groves Academy's Professional Institute  ("Groves") for over five years. Groves provided training in the Wilson Reading System to a cadre of Minnetonka's teachers.

71. Katharine Campbell, Executive Director of Groves, testified that she has trained all of the District staff in Wilson Reading who have provided reading instruction for the Student. She testified that they are excellent teachers and performed the instruction with fidelity.

## IV.   Procedural Background.

72. **Due Process Complaint**.  On August 8, 2019, the Parents filed a special education due process complaint pursuant to IDEA.  The issues for hearing were:

    a.  Whether the District failed to provide adequate and timely evaluation of the Student from kindergarten to date.

    b.  Whether the District failed to properly and timely identify the Student's disabilities and education needs from kindergarten to date.

    c.  Whether the District failed to design and provide the Student with special education programs containing appropriately ambitious goals and challenging objectives designed to produce meaningful progress and close the academic gaps from kindergarten to date.

    d.  Whether the District failed to adequately and timely review and revise the Student's IEPs when he failed to make expected progress from kindergarten to date.

    e.  Whether and to what extent the District has denied the Student a FAPE from kindergarten to date, including as the result of lack of consistent implementation.

    f.  Whether the private services provided by his Parents from kindergarten to date have been appropriate.

    g.  What are the appropriate methods (including qualifications of instructors) and quantity of specialized instruction necessary to provide the Student a FAPE.

    h.   What are the appropriate methods and quantity of specialized instruction

        necessary to make-up to the Student for the progress he missed since

        kindergarten.

    i.   Whether the Student is entitled to a private school program that will meet his

        needs at public expense.

73. In their complaint, the Parents requested the following  relief: (1) an  Independent

Education Evaluation ("IEE") at public expense; (2) a determination that the District

violated its obligations under the IDEA to properly and timely identify, evaluate, place

and provide a FAPE to the Student since kindergarten; (3) reimbursement for private

services provided by the Parents; and (4) placement in a private school or private services

program providing learning disability-specific special education designed to close the

academic gaps.  Alternatively, the Parents requested an order specifying the methods and

intensity of instruction to be provided to the Student by the District and sufficient

compensatory education services.

74. On August 9, 2019, the MDE appointed ALJ Barbara J. Case to hear the case.  The

hearing was designated as MDE File No. 20-004-H, Office of Administrative Hearings

File No. 82-1300-36317.

75. On August 15, 2019, a resolution session was held.   At the resolution session, the Parents'

attorney asked the District on the Parents' behalf to contact Groves Academy and "grease

the skids" with Groves Academy to admit the Student.  The District indicated that it would

contact Groves Academy to learn if there was a possibility of admitting the Student. The

Parents also requested that an IEE at public expense be done by Dr. Rebekah Hudock a

neurophysiologist with expertise in ASD, Dr. Richard Ziegler, a neurophysiologist, and an evaluator from Groves Academy.

76. Following the resolution session, the School District offered to pay for the IEE's the Parents were requesting up to a maximum of $10,000.00 and the offer specified that the IEE's should be completed in 45 days. The Parents then changed their demand and asked that Mr. John Alexander, a consultant with Groves Academy, do an evaluation in addition to Dr. Ziegler and Dr. Hudock.

77.  Pursuant to the Parents' request, on August 19, 2019, the District's Special Education Director contacted Groves Academy.  Groves Academy informed the District that the Student was not admitted to Groves Academy because Groves Academy staff "observed a lack of engagement, both socially and academically," that would interfere with his learning at Groves Academy and required a different kind of support than Groves Academy could provide.

78. The District specifically asked if the fact that the Student was eligible for services under the ASD category was prohibiting the Student from being enrolled at Groves. Groves responded that the eligibility category was not the issue; it was the Student's lack of engagement with people and the academic tasks when he visited Groves that prevented his admission.

79. On August 28, 2019, the Student and the Parents filed a Motion to extend the statutory timelines under IDEA in order to allow their experts, neuropsychologists Richard Ziegler and Rebekah Hudock as well as Mr. John Alexander, a consultant working under Ms. Campbell at Groves, to evaluate the Student.

80. Parents later withdrew the request that Mr. Alexander evaluate the Student and identified him as an expert witness.

81. On September 4, 2019, the District filed a response to the motion to extend the hearing timelines objecting to the Parents' extension of time for the purpose of conducting discovery – that is, for the purpose of allowing the Parents' experts to not only evaluate the Student but to interview school district staff and observe the Student in school in order to prosecute their case.

82. On September 12, 2019, the ALJ issued an Order granting the Parents' motion to extend timelines for the completion of the Parents' expert witnesses to evaluate the Student and the District programming.

83. As result, the hearing that should have taken place within 45 days of the request, took place more than three months later.

84. On September 24, 2019, the District filed a motion arguing that the IDEA statute of limitations is two years and that the Parents should be prevented from asserting claims before August 8, 2017.

85. On October 23, 2019, Dr. Ziegler and Dr. Hudock completed their evaluations of the Student.

86. On October 31, 2019, the ALJ issued the Statute of Limitations Order finding that the statute of limitations was four years—from kindergarten to grade 4—using the "2+2 approach" and that the Parents knew or should have known of the basis of their alleged claims at the start of the Student's second grade year, but  noting that the date may be moved depending on the facts presented at the due process hearing. The ALJ relied on the

reasoning of another Minnesota ALJ and ignored the applicable 8th Circuit precedent and the precedent of this Court.

87. The due process hearing took place on December 3, 4, 5, 9, and 10, 2019, before Judge Case.

88. At the hearing, the Student's mother testified that the Parents were no longer seeking placement in a private school at the District's expense. The Parents also dropped their claim that the Student's third grade Wilson Reading System instructor, a para-professional, was not qualified to teach him.

89. On January 30, 2020, the ALJ issued her Findings of Fact, Conclusions of Law and Recommendation (sic) and Order (" Decision") finding against the District.

90. The District now appeals the Statute of Limitations Order in its entirety and the Decision in its entirety, except for the costs for private educational services from 2016 until August 8, 2019 that were found non-reimbursable.

## IV.    Grounds for Appeal

91. **Statute of Limitations Order.**  The ALJ erred when she held  that the statute of limitations in an IDEA case is four years. She adopted a "2+2 approach" relying on another Minnesota ALJ's adoption of the Third Circuit's reasoning. The ALJ in this case completely ignored the Eighth Circuit jurisprudence  that makes clear that the IDEA's statute of limitations is  two years. *See  C.B. ex rel. B.B. v. Special Sch. Dist. No. 1*, 636 F.3d 981, 989 (8th Cir. 2011); *Lathrop R-11 Sch. Dist. v. Gray*, 611 F.3d 419, 428 (8th Cir. 2010); *Strawn v. Missouri State Bd. of Educ.*, 210 F.3d 954, 957-59 (8th Cir. 2000). She ignored the precedent of this Court as well.  *Indep. Sch. Dist. No. 413 v. H.M.J.*, 123 F. Supp. 3d 1100, 1113 (D. Minn. 2015); *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 357 F.

Supp. 3d 876, 888–89 (D. Minn. 2019) (appealed to 8th Circuit); *R.M.M. v. Minneapolis Pub. Sch.*, No. 15-CV-1627, 2017 WL 2787606, at *6 (D. Minn. June 27, 2017).

92. The ALJ erred when she based her conclusion that the District failed to provide the Student FAPE, in part, on the District's purported actions occurring prior to August 8, 2017, outside the two- ear statute of limitations found in the IDEA.

93. **Factual  and Legal Errors**. ALJ made numerous factual errors in her Decision including but not limited to the following.

94. Finding No. 5 states in error: "The parties do not dispute that the Student's IQ falls within the average range with a score of 105". (Decision, Finding No. 5.) The ALJ references the District's 2018 evaluation as evidence of the Student's IQ but the document states no such thing. This is but one example illustrating that the ALJ was not careful and precise in her reporting of the facts or the law in her Decision.

95. In Finding No. 7, the ALJ finds that the parties did not dispute that the Student had "…an (sic)  Other Health Disability". She cites no evidence to support this finding and none exists. Neither party ever suggested the Student had an "other health disability"  or more accurately stated, neither party argued that the Student should have been qualified under the Minnesota criteria for Other Health Disability. There is no requirement that a school district qualify a student under every category of state criteria that could be used to qualify him for special education. Instead, the District's obligation was to qualify the Student and then address each of his needs whether they flowed from the qualifying disability or not.

96. In this case, the Student's IEP team  initially qualified him under the ASD criteria. His needs in reading especially in phonics, phonemic awareness and decoding were identified

18

and the data supporting those needs was described in each evaluation. The ALJ herself finds over and over in her Decision that the District identified these needs.

97. The Student needs in written language, handwriting, math, social skills, and attention were also specifically identified in his evaluations. The needs were addressed by special education instruction outlined in the IEPs. His needs in DAPE and Speech were also identified, and these related services were provided.

98. Finding No. 15 further illustrates the ALJ's misunderstanding of the law. She finds that in the District's 2018 evaluation, it found the Student eligible for DAPE and Speech services. She compares a speech disorder with the definition of a specific learning disability and later concludes that the District did not properly identify the Student. This further illustrates her misunderstanding of the law and the misapplication of it that drove her erroneous Decision.

99. The Eighth Circuit articulated "that the particular disability diagnosis . . . will, in many cases, be substantively immaterial." *Fort Osage R-1 Sch. Dist. v. Sims*, 641 F.3d 996, 1004 (8th Cir. 2011). The ALJ ignored the substantial precedent in this area.

100. The District evaluated M.L.K. in all areas of suspected disability and identified all of M.L.K.'s educational needs in its evaluations, including the Student's reading and written language needs.

101. Finding of Fact No. 38 line two is false. The ALJ cites Dr. Ziegler as testifying that as early as pre-school the deficits that Student "exhibited in rapid naming and rapid digit naming were indicative of a child with a SLD [specific learning disability] even at this early point." He does not state at any time that the Student's rapid naming and rapid digit naming in pre-school indicated he had a specific learning disability.

102. The ALJ erred when she awarded reimbursement for private speech and other services where there was no datain  the record showing that the services produced benefit. The Student had private services once per week from grade 1 to middle grade 3. In contrast, the Student received  between a minimum of 30 minutes daily of academic support, increasing to 60 minutes per day coupled with many other services including occupational therapy and social/speech services. The ALJ erred when she made a determination that the private services benefitted the Student's reading or benefitted him otherwise.

103. The ALJ erred when she did not give sufficient weight to the views of the District's professional educators in multiple situations. She gave full weight to the opinions of Dr. Ziegler who could only testify that the Student needed "more" of what the District was doing and when pressed could only agree to what Mr. Alexander recommended.

104. The ALJ erred when she found that the District denied the Student Wilson Reading System because it continued to believe that his ASD was an impediment to the program's usefulness. There is no testimony or evidence presented by the District that the Student's mild ASD prevented him from being in Wilson Reading system. The District never made this argument.

105. The ALJ erred when she granted a lengthy extension to allow the IEE to be conducted during the hearing.

106. When the experts had completed their evaluations of the Student and the District's programming, the District had an obligation under the law to consider the recommendations. It did so. The IEP team choose to follow the recommendations and increase the Student's Wilson Reading  Services  and add the phonemic awareness curriculum that Mr. Alexander recommended. The District rejected the phonemic

awareness curriculum that Dr. Ziegler recommended because  the curriculum was designed for much older students.

107. Under IDEA, the proper procedure would have been for Parents to seek an IEE when they disagreed with the District's evaluation. Here they disagreed more than a year later and only as part of a hearing request.

108. Under IDEA, the proper procedure would have been to have the IEP team consider the IEE results and if the team agreed, implement them.  The Parents would then have had an opportunity to seek hearing if there was not agreement.

109. Instead, the ALJ allowed the Parents, through their experts, to conduct discovery and when the District considered and added the recommendations, she found that to be evidence of a failure by the School District.

110. The ALJ erred when she did not allow Ms. Campbell to testify as to whether the provision of 2 hours per day of reading instruction one to one by a licensed special education teacher also certified in Wilson Reading System was an appropriate public-school education. She did not allow Ms. Campbell to testify as to the state of reading instruction in Minnesota or to the fact that Minnetonka was the only District in the State to have Fundations, Wilson Reading System and certified instructors in each.. She did not allow Ms. Campbell to testify that Minnetonka in fact had trained the majority of the Wilson certified instructors in Minnesota although the Parents' Exhibits contained a list of all the certified instructors in the State more than 2/3rds of whom were trained at District expense and are District staff.

**V.      Relief**

The School District seeks an order reversing the Statute of Limitations Order; finding that the District is not responsible for the costs of the IEE, and entering  judgment in favor of the District and ordering that it recover its costs and disbursements, together with whatever other relief this Court deems just and equitable.

**RATWIK, ROSZAK & MALONEY, P.A.**

Dated: _April 28. 2020_____

Laura Tubbs Booth, #186910
Adam J. Frudden, #400068
730 2nd Ave. S., Suite 300
Minneapolis, MN 55402
(612) 339-0060
ltb@ratwiklaw.com
ajf@rartwiklaw.com
***Attorneys for Plaintiff***