## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In the Matter of Minnetonka Public
Schools, Independent School District
No. 276,

                    Plaintiff,

v.

M.L.K., by and through his
Parents, S.K. and D.K.,

                    Defendants.

Civil No. 20-1036 (DWF/KMM)


**MEMORANDUM
OPINION AND ORDER**

---

Adam Frudden, Esq., Christian R. Shafer, Esq., and Laura Tubbs Booth, Esq., Ratwik, Roszak & Maloney, P.A., counsel for Plaintiff.

Amy J. Goetz, Esq., School Law Center, LLC, and Ted A. Johnson, Esq., Cronan Pearson Quinlivan, PA, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on cross motions for judgment on the administrative record (Doc. Nos. 16, 21) after an administrative law judge ("ALJ") issued a January 30, 2020 decision (Doc. Nos. 1 ("Compl."), Doc. No. 1-2 (the "Decision")). In the Decision, the ALJ ruled in favor of a student, M.L.K. ("Student"), who by and through his parents, S.K. and D.K. ("Parents"), lodged a due process complaint under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq*. ("IDEA"). Plaintiff Minnetonka Public Schools, Independent School District No. 276 (the

"District") seeks reversal of the Decision.  Parents argue that the Decision should stand.

For the reasons set forth below, the Court grants in part and denies in part both motions.

## BACKGROUND

Parents assert that when Student was midway through fourth grade, he had not

learned to read or write as well as most first-grade students despite his hard work,

compliance and intelligence, as well as the receipt of special education benefits for four

years.  Parents contend that Student demonstrated, and his educational records

documented, classic characteristics of a child with dyslexia and Attention Deficit-

Hyperactivity Disorder ("ADHD").  Parents further contend that District did not identify

Student's "unmistakable indicators of dyslexia since kindergarten" and ultimately

"provided ineffective and misdirected educational services based on a fundamental

misunderstanding of his disabilities and educational needs."  (Doc. No. 23 at 1-2.)  The

Administrative Record demonstrates that Student has average intelligence combined with

severe dyslexia, significant ADHD, a speech/language disorder, and mild Autism

("ASD").  (Doc. No. 13 (Administrative Record ("AR")).)

The Court briefly summarizes the facts related to Student's educational needs and

the District's identification and response to those needs.[1]  The District completed

---

[1]     The relevant facts are contained in the Administrative Record and are
comprehensively set forth in the Decision.  The educational supports and programming
noted herein are not exhaustive.  The Administrative Record details efforts by the IEP
team to address other needs, many connected to Student's ASD.  The Court has reviewed
the record and takes it into account in its entirety.  The Court's summary, however,
focuses primarily on Student's educational needs and services as they relate to academics
and, more specifically, to reading and writing.

evaluations of Student in both 2015 and 2018 and implemented an Individual Education Program ("IEP") in 2015, which it amended several times as Student progressed through grade levels.  (*Id*.)

In 2014-2015, Student attended Ready Set Kindergarten ("RSK").  In the spring of 2015, Student was evaluated for special education services.  The IEP team found him eligible for services under ASD.  (AR at 45-67 ("2015 Evaluation").)  The evaluation found that he had "average cognitive ability" but that his academic scores "fell significantly below the average range" of his peers (below the first percentile on both math and literacy assessments), and that the assessment results in the area of ASD "indicated significant challenges and concerns" with social interaction and communication.  (*Id*.)  With respect to Student's literacy and language skills, the evaluation noted "[e]volving skills" in reciting the alphabet without singing, identifying letter sounds, and reading early sight and survival words.  The District found Student's educational needs to include:  "phonics, decoding, written expression and spelling, math skills and concepts," "focus/attention," and a need to increase cooperative play and social engagement.  (*Id.* )  While in RSK, Student received 1:1 support with phonics from a paraprofessional and 1:1 reading instruction, along with additional supports.  (*Id*.)  The IEP team concluded that Student needed to increase his reading, written language, and math skills and set short term objectives and benchmarks to meet specific goals.  Parents participated in and received notice of the evaluation.

In kindergarten (2015-2016), Student's IEP included direct special education instruction in small groups for 30 minutes, 5 days a week—instruction was in reading,

written language, and math.  (AR at 71-89.)  The IEP contained goals and services, including those for reading and written language skills.  For example, the IEP set goals for letter sounds and phonics, sight word recognition, written language, math, social emotional and attentional needs.  The District sent out reports indicating areas of progress, but also noting that Student was not at grade level.  For example, the District noted that Student improved his reading skills (progress in sounds of letters, able to read 6 high frequency sight words) but did not meet expected growth.  (*Id*. at 82.)

In spring before entering first grade (2016-2017), the IEP team increased Student's special education services in order to address his learning needs in reading, writing and math.  Student received twice daily 1:1 instruction in these areas.  Student also received social skills services twice a week for 30 minutes.  The spring 2016 IEP became Student's IEP for first grade.  (AR at 102-110.)  This IEP included goals in various areas, including reading and written language, such as being able to give the sound of 26/26 letters, being able to read 15/25 high frequency sight words, and 8/10 CVC words.  Student made progress in some areas (such as learning high frequency words and letter sounds), but his grade reports reflected continuing challenges with attention, executive function, and reading.  Mid-year, Student was reading independently at a kindergarten level.  In spring 2017, the IEP team met and proposed an IEP for second grade.

In second grade (2017-2018), the Student's IEP noted the continued need for support in reading, especially in decoding and fluency, and with writing and spelling, noting a "significant lag" behind his peers in phonological processing and oral expression despite gains from fall 2016 to June 2017.  One goal was to increase Student's ability in

4

phonetic awareness from beginning/developing levels (level B) to being able to perform at level F (mid first-grade level). The IEP also listed goals related to attention, social interaction, and math. In second grade, Student had 1:1 reading time with a licensed special education teacher, daily 1:1 instruction in handwriting, and 40 minutes daily in small groups with a second licensed special education teacher.

With Parents' consent, the District reevaluated Student in spring of second grade (2018). (AR at 157-172.) The District found that Student remained eligible for special education—and, in part, had continued needs in reading, phonics skills, math, writing, speech, language, social-skills and ASD-related needs. The evaluation showed that Student qualified for Developmental Adaptive Physical Education: Special Education ("DAPE") and Speech and Language Services. After the evaluation, the District proposed amending the IEP, indicating the need for "intense support" in reading and writing (especially in decoding and fluency) and that Student was below grade-level in phonological processing. The IEP listed goals, for example increasing from reading Level C (kindergarten level) to Level F (mid-first grade level) and mastering corresponding skills. By the end of second grade, Student continued to struggle with executive function, reading, writing, and spelling. Despite some progress, Student's testing showed that he was performing at the 7th percentile in reading.

During the first half of third grade (2018-2019), Student received 45 minutes daily in a small group for reading with a special education teacher, an additional 20 to 30 minutes of 1:1 reading training with a special education teacher, and paraprofessional support. Parents requested that Student receive instruction in the Wilson Reading System

("WRS"), but school professionals noted he would be a good candidate for WRS in fourth grade.  In his mid-year progress report, Student was reading at the level appropriate for end of kindergarten to beginning of first grade.  The goals laid out for Student in the middle of third grade were similar to those set for Student the year before. At this time, Parents became increasingly concerned with Student's lack of progress and again requested that the District use WRS, instead of the system it was using.  The District recommended that Student continue to use the current system, maintaining that Student was making reading progress while continuing to struggle with attention and focus.

In November 2018, Parents provided a Neuropsychological Evaluation Report from Fraser Center.  The report noted difficulties associated with ASD, ADHD, and "[s]ignificant difficulties with reading skills and significant delays in his phonetic processing abilities consistent with a diagnosis of Specific Learning Disability with Impairment in Reading."  (AR at 410.)

In early 2019, the District reported progress with attention and focus, but also that Student's reading level continued at an end of kindergarten/beginning of first grade level. By mid-February, Student's reading level had increased to a mid-first grade level.  Also in February, Student's IEP was amended at Parent's continued request to use WRS.  The District also increased the goals for Student, but overall they were similar to past goals and objectives.  During the second half of Student's third-grade year, Student received 60 minutes of WRS intensive instruction for reading four times per week in a small group and paraprofessional support with reading and writing throughout the day.  At the end of

third grade, Student had progressed in his average words per minute, fluency, word identification, and decoding, but continued to struggle with attention, some executive functioning skills, and with reading and spelling.  Student remained at a first-grade level and testing showed him at the 1st percentile in reading.

Beginning in March 2019, Parents paid for private WRS instruction from Groves Academy and later hired private tutors to provide additional reading instruction.  And at the suggestion of the District's WSR trainer, Student's mother attended a WRS training program.[2]

On August 8, 2019, Defendants filed a special education due process complaint under the IDEA.  (Compl. ¶ 72; Decision at 33.)  Parents requested, among other things, an Independent Education Evaluation ("IEE").  The timeframe for the IEE was extended over the District's objection.  Between August and October 2019, an IEE was performed by the University of Minnesota's Masonic Children's Hospital Division of Clinical Behavioral Neuroscience.  The IEE was prepared by Dr. Richard Ziegler and Dr. Rebekah Hudock.  Dr. Ziegler is an expert in pediatric neuropsychology and Dr. Hudock specializes in ASD.  Dr. Ziegler determined that Student has ADHD and is severely dyslexic.  The District agreed that Student has ADHD, significant dyslexia, and mild ASD.  (Decision at 5-6 ¶¶ 17-18, 22.)  After the completion of the IEE, the IEP team convened.  Drs. Ziegler and Huduck and Mr. Alexander (a literacy/dyslexia consultant) were included.

---

[2]     Parents also paid for a private reading tutor during the summer of 2018.

In November 2019, when Student was in fourth grade,[3] the District proposed a new IEP for Student.  This IEP increased the amount of time Student received special education services but continued to identify Student's primary disability as ASD and his secondary disability as Speech/Language disorder.  (AR at 328-352.)  The IEP offered 1:1 reading instruction for 90 minutes per day, 4 days per week with a reading specialist and an additional 20 minutes per day to support phonemic awareness skills. Parents consented to the amended IEP with written objections.

The due process hearing was held in December 2019.[4]  The following issues were addressed:  (1) whether the Student met his burden to prove that the District failed to provide the Student with a Free Appropriate Public Education ("FAPE"); (2) whether the District met its burden to prove that its evaluation of the Student met the requirements of 34 C.F.R. §§ 300.304-.306 and 20 U.S.C. § 1414(b)(1)-(3); (3) if Student was denied a FAPE, whether the private services obtained by Parents were appropriate and appropriate for reimbursement; (4) if Student was denied a FAPE, what are the appropriate methods, including qualifications of instructors, and quantity of specialized instruction, reasonably calculated to provide Student a FAPE; and (5) if Student was denied a FAPE, what are

---

[3]     During the first half of fourth grade, Student had been receiving 60 minutes of WRS intensive instruction for reading in a small group setting (three students total) 5 days per week and paraprofessional support in reading throughout the day.

[4]     The hearing occurred over a period of 5 days, and the record closed on December 20, 2019.

the appropriate methods and quantity of specialized instruction necessary to compensate Student for the progress he missed since kindergarten.  (Decision at 1-2.)[5]

On January 30, 2020, the ALJ issued the Decision, finding that:  (1) Parents timely filed due process hearing requests; (2) Parents met their burden to prove that the District denied Student a FAPE; and (3) the District did not meet its burden to prove that its April 23, 2018 evaluation was appropriate.  (*Id*. at 35-36.)  With respect to the FAPE, the ALJ found that the District did not:

- assess Student in all areas of suspected disability;

- review existing data and on the basis of that review identify what additional data are needed to determine the Student's levels of academic achievement and related developmental needs and whether any additions or modifications to the special education and related services were needed to enable Student to meet the measurable annual goals set out in the IEP and to participate, as appropriate, in the general education curriculum;

- develop IEP goals that included how Student's disabilities affected his progress in the general education curriculum, include measurable goals designed to meet Student's needs that resulted from his disability to be involved in and make progress in the general education curriculum and meet Student's other needs that resulted from his disability;

- develop an IEP considering all required factors;

- revise the IEPs to determine if the annual goals were being achieved and revise it to address any lack of expected progress toward the annual goals and in the general education curriculum; and

---

[5]    In a separate decision dated October 31, 2019, the ALJ issued an Order on Motion Regarding Limitations Period, denying the District's motion arguing that the IDEA statute of limitations limits Student's claims for compensatory education to those that occurred after August 8, 2017 (two years before the date Parents filed a due process complaint).  (Doc. No. 1-1 (the "Limitations Decision").)  The Limitations Decision is also found in the Administrative Record.  (Doc. No. 13-5 at 92.)

- propose IEPs that were reasonably calculated to enable Student to receive educational benefits and progress appropriate in light of Student's circumstances.

(Decision at 35-36.)

In the Decision, the ALJ explained that "it is not primarily the lack of specific diagnosis or identification of needs that leads to the conclusion that the Student did not receive a FAPE. Instead, it is the lack of emphasis on critical skills at critical junctures, and the failure to revise the IEP as appropriate to address Student's lack of expected progress." (Decision at 42.) The ALJ found that:

> [R]egardless of how the District labeled Student, when Student could not read, and did not make progress in reading through first, second, and third grade, the District did not recalculate the IEP, goals, services, and accommodations to address Student's lack of progress. Instead, the District's IEPs repeated goals, marked the Student as making adequate progress, did not reassess as necessary, did not increase services during multiple school years, and did not consider ESY.

(*Id*.) Further, the ALJ explained that Student was denied a FAPE "in large part because the District did not accurately identify his disabilities, did not review his progress as often as his lack of progress in a critical area warranted, and therefore did not revise his IEP to provide the level and intensity of services needed." (*Id*. at 44.) The ALJ also emphasized the fact that no Extended School Year ("ESY") services were offered to Student.

Both parties now move for judgment on the administrative record. The District argues that the ALJ erred in its ruling on the applicable statute of limitations, erroneously concluded that the District failed to properly evaluate Student, and that the District

provided the Student with a FAPE.  Parents argue that the Decision should be affirmed in its entirety.

## ANALYSIS

### I.    Standard of Review

"A Motion for Judgment on the Record, in the context of the IDEA, is a request that the Court enter a final Judgment in what is essentially 'a bench trial on a stipulated record.'"  *Slama v. Indep. Sch. Dist. No. 2580*, 259 F. Supp. 2d 880, 882 (D. Minn. 2003) (citation omitted).  The IDEA provides that a court reviewing a state administrative decision "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *see also Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015) (noting that when reviewing administrative decisions, "[t]he district court must make its decision independently, based on a preponderance of the evidence, as to whether the IDEA was violated").  Thus, "the district court must 'independently determine whether the child [in question] has received a FAPE.'"  *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011) (quoting *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003)).  At the same time, courts should give the ALJ's decision "due weight."  *Id.* (quoting *Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 561 (8th Cir. 1996)).  The Eighth Circuit has emphasized that the court's "review is not necessarily de novo," and that a court "should not substitute its judgment for that of the school officials."  *Sneitzer*, 796 F.3d at 948.

The "limited grant of deference" under this standard "is appropriate in IDEA cases because the ALJ 'had an opportunity to observe the demeanor of the witnesses and because a [district] court should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s].'" *K.E. ex rel. K.E.*, 647 F.3d at 803 (quoting *CJN*, 323 F.3d at 636). The Eighth Circuit has noted that "[t]his somewhat 'unusual' standard of review is less deferential than the substantial-evidence standard commonly applied in federal administrative law." *Id.* (quoting *Indep. Sch. Dist. No. 283*, 88 F.3d at 561). "Whether a child has received a FAPE is a mixed question of law and fact." *Id.* at 804. The Court reviews questions of law *de novo*. *See R.M.M. v. Minneapolis Pub. Schs.*, Civ. Nos. 15-1627, 16-3085, 2017 WL 2787606, at *4 (D. Minn. June 27, 2017.)

## II.    Statute of Limitations

In the Limitations Decision, the ALJ denied the District's motion to limit claims for compensatory education to those that occurred after August 8, 2017—two years before Parents filed a due process complaint. The District argues that the ALJ erred in applying the IDEA's statute of limitations in two ways: first, in applying a two-year plus two-year limitations period (the "2+2" period); and second, by ruling that the Parents' claims began to accrue when they learned of the potential legal significance of the challenged actions, as opposed to learning of the actions themselves.

The ALJ first determined that Parents knew or should have known of the District's alleged violations at the start of Student's second grade year, which would have been roughly August 2017. Using this date, the ALJ explained that the complaint must be

12

filed within two years of this date *and* that "claims that occurred more than two years

prior to this date are not considered."  (Limitations Decision at 12.)  Under this approach,

the ALJ deemed that claims based on District actions in 2015 and after were timely:

> Based on the application of the 2+2 standard, all of Student's claims since
> kindergarten may be considered.  The record shows that the Parents were
> aware of the District's alleged actions which form the basis of the
> Complaint at the start of [Student's] second grade year in 2017.
> Consequently, under the 2+2 rule, Student's claims going back to the start
> of Student's kindergarten school year in 2015 may be considered.  The
> Student filed for a hearing on August 8, 2019, less than two years from
> when the Parents knew or should have known of the School District's
> alleged violations.

(*Id.* at 13.)  In adopting the 2+2 approach, the ALJ relied on other cases before Minnesota

hearing officers and a Third Circuit Court of Appeals decision.  *See, e.g.*, *G.L. v. Ligonier*

*Valley Sch. Dist. Auth.*, 802 F.3d 601, 610 (3d Cir. 2015).

The parties dispute whether the application of the 2+2 approach was proper.  The

District argues that this approach is not in line with Eighth Circuit precedent.  In contrast,

Parents contend that the 2+2 rule is grounded in both the statutory text and the canons of

statutory construction.

The IDEA provides that a parent's request for a due process hearing must be

"within 2 years of the date the parent [] knew or should have known about the alleged

action that forms the basis of the complaint . . ."  20 U.S.C. §1415(f)(3)(C).  A second

provision, 20 U.S.C. § 1415(b)(6)(B), requires state and local educational agencies to

develop a procedure that encompasses "[a]n opportunity for any party to present a

complaint . . . which sets forth an alleged violation that occurred not more than 2 years

before the date the parent [] knew or should have known about the alleged action that

forms the basis of the complaint."[6]

The Eighth Circuit Court of Appeals has not adopted the 2+2 statute of limitations

period under the IDEA.[7]  Indeed, the Eighth Circuit Court of Appeals has consistently

applied a two-year statute of limitations period under the IDEA.  For example, the Eighth

Circuit recently explained that "[a]ny claim of a breach falling outside of the IDEA's

two-year statute of limitations would be untimely."  *Indep. Sch. Dist. No. 283 v.*

*E.M.D.H.*, 960 F.3d 1073, 1083 (8th Cir. 2020) (explaining that some claims accrued

within limitations period because of District's "continued violation" of child-find duty);

*see also C.B. ex rel. B.B. v. Special Sch. Dist. No. 1*, 636 F.3d 981, 989 (8th Cir. 2011)

("Given the IDEA's two-year statute of limitations . . . C.B. challenged the special

---

[6]     These two provisions appear to move in opposite directions from the "knew or should have known" date and have created confusion.  The District argues that the two provisions should be, and have been, interpreted identically.  *See, e.g.*, *R.M.M. v. Minneapolis Public Schs.*, 2017 WL2787606, at *6 (applying two-year statute of limitations, citing both provisions and 34 C.F.R. 300.507(a)(2)); *Indep. Sch. Dist. No. 413, Marshall v. H.M.J. ex rel. A.J. and M.N.*, 123 F. Supp. 3d 1100, 1113-14 (D. Minn. 2015) ("No party may recover for a violation occurring outside the two-year statute of limitations" but allowing ALJ to consider evidence arising from before the statute of limitations period, citing 20 U.S.C. § 1415(b)(6)(B)).

The ALJ, however, interpreted the IDEA as having both a forward-looking and a backward-looking limitations provision—with 20 U.S.C. §1415(b)(6)(B) allowing claims for up to two years before the date of discovery.  This interpretation, in effect, creates a four-year limitations period.

[7]     The parties have not cited, and the Court has not found, any case in the Eighth Circuit directly on point.  And the parties agree that no binding precedent exists on the interplay between these two IDEA provisions.  (Decision at 9.)

education services provided by the School District in fourth and fifth grade."); *Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d 419, 428 (8th Cir. 2010) ("We also do not consider allegations regarding incidents beyond the two year statute of limitations applicable to IDEA claims . . .").[8]  Considering the dearth of support in this circuit for the application of the longer statutory period, and reviewing the ALJ's application of the statute of limitations *de novo*, the Court finds that it was erroneous for the ALJ to use that approach.[9]  Instead, unless and until the Eighth Circuit Court of Appeals rules otherwise, the proper statute of limitations under the IDEA is two-years.  Because Parents filed their due process complaint on August 8, 2019, any claims based on District actions before August 8, 2017 are untimely.  Therefore, claims based on the District's actions during

---

[8]     Courts in this circuit have also recognized that the statute of limitations "shall not apply to a parent" in two situations, neither of which are relevant here.  *See R.M.M. v. Minneapolis Public Schs.*, 2017 WL 278606, at *6.  The two situations are:  (1) where the parent was prevented from requesting a hearing due to "specific misrepresentations by the local education agency that it had resolved the problem forming the basis of the complaint;" or (2) where the local educational agency withheld information from the parent that the law requires be provided.  *Id.* (citing 20 U.S.C. § 1415(f)(3)(D).)

[9]     Parents cite to *N.D.S. v. Acad. for Science and Agric. Charter Sch.*, Civ. No. 18-0711, 2018 WL 6201725, *3 (D. Minn. 2018), as a case supporting its proposed application of the statute of limitations.  In *N.D.S.*, the court considered the question of whether a due-process complaint filed on December 29, 2017, which challenged the adequacy of a December 16, 2015 IDEA re-evaluation, was time barred.  *Id.* at *3.  The court expressed agreement with opinions from the Third and Ninth Circuits interpreting the IDEA's limitations period and noted "[a]s those court have held, 'IDEA's statute of limitations is triggered when 'the parent . . . *knew or should have known* about the alleged action that forms the basis of the complaint,' rather than when the school's unlawful action occurred."  *Id.*  That case, however, did not address the application of the 2+2 approach.

Student's kindergarten and first grade years are time-barred.[10]  To this limited extent, the

Decision of the ALJ is reversed and reimbursement for any costs for compensatory

education incurred before August 8, 2017 are not recoverable.

## III.    IDEA Claims

The District also challenges the ALJ's determination that the District failed to

establish that its evaluation of Student in 2018 was appropriate and that the District

denied Student a FAPE.

The IDEA establishes a right to a "free appropriate public education" for children

with disabilities.  *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester*

*Cnty. v. Rowley*, 458 U.S. 176 (1982).  "The core of the statute . . . is the cooperative

process that it establishes between parents and schools."  *Schaffer v. Weast*, 546 U.S. 49,

53 (2005).  "The IEP is 'the centerpiece of the statute's education delivery system for

disabled children.'"  *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S.

Ct. 988, 994 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).  An IEP is "a

written statement for each child with a disability that is developed, reviewed, and revised

in accordance with" the IDEA's requirements.  20 U.S.C. § 1414(d)(1)(A)(i).  The

IDEA's procedural requirements for developing a student's IEP "emphasize collaboration

among parents and educators and require careful consideration of the child's individual

circumstances."  *Endrew F.*, 137 S. Ct. at 994.  "Each IEP must include an assessment of

---

[10]    Because the Court concludes that the application of the 2+2 period was in error, the Court need not reach the District's alternative argument for why the Limitations Decision should be reversed.

the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer*, 546 U.S. at 53 (citing 20 U.S.C. § 1414(d)(1)(A)).  A student receives a FAPE if the student's IEP is "reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at 206; *Endrew F.*, 137 S. Ct. at 999 (student's IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances").  "Appropriate progress" will vary from child to child.  *Endrew F.*, 137 S. Ct. at 1001.

The IEP process begins with a "full and individual initial evaluation."  20 U.S.C. § 1414(a)(1)(A).  This evaluation is used to determine whether a student is entitled to special education and related services.  *Id*.  The IDEA requires school districts to evaluate students in all areas of suspected disability.  Minn. R. 3525.2710, subp. 3(C)(4); *see* 34 C.F.R. § 300.304(b).  If a student's parents disagree with an evaluation, they can request an IEE at public expense, at which point the school must either pay for the IEE or defend the evaluation at a due process hearing.  *See* 34 C.F.R. § 300.502(b)(1), (2).  Generally, a school must reevaluate a child at least once every three years.  20 U.S.C. § 1414(a)(2)(B).

In the Decision, the ALJ ruled that the District did not meet its burden to prove that its 2018 special education evaluation was appropriate, such that it did not need to provide an IEE at public expense.  (Decision at 36.)  The ALJ explained that multiple experts in SLD concur that Student's primary disabling condition is his dyslexia and that his secondary disability in greatest need is his ADHD.  (Decision at 41.)  In addition, the

ALJ concluded that the District denied the Student a FAPE.  The ALJ explained that in

this case, Student's most debilitating disabilities were not identified and the District

failed to provide appropriate services to ensure that Student was able to make adequate

educational progress.  (*Id*.)  The ALJ noted Student's lack of progress, IEP goals that

were not measurable, progress reports that were not meaningful, a failure to reassess

Student as necessary to address his lack of progress, and repeated denials of ESY

services.  (Decision at 42-44.)

The ALJ considered and rejected the District's assertion that it knew that Student

had dyslexia and ADHD and that the specific identification of those disability categories

would not have altered the services provided.  The ALJ stated:

> The District asserts that the IEE told it nothing it did not already know, that
> it knew Student had dyslexia and ADHD but that identifying those
> disability categories on Student's IEP would not have altered the services it
> provided.  IDEA, as reflected in *Fort Osage*,[11] does not requires that all
> disabilities be identified, but only that, "all areas of suspected disability" be
> addressed in a district's evaluation, "whether or not commonly linked to the
> disability category in which the child has been classified."  However, this
> does not mean that, where a district has knowledge of significant
> disabilities impacting a student, it may leave those diagnoses out of its
> evaluations and off the student's IEP.  Doing so is contrary to *Fort Osage's*
> acknowledgment that IDEA intends IEPs to contain accurate disability
> diagnoses and the Supreme Court's finding in *Endrew F*. . . .

---

[11]     Both parties cite to *Fort Osage R-1 Sch. Dist. v. Sims*, 641 F.3d 996 (8th Cir.
2011).  In *Fort Osage*, the Eighth Circuit states "the particular disability diagnosis affixed
to a child in an IEP will, in many cases, be substantively immaterial because the IEP will
be tailored to the child's specific needs."  *Id*. at 1004.  Therefore, an IEP that does not
accurately diagnose a student is not automatically set aside.  *Id*.  Rather, "the party
challenging the IEP must show that the failure to include a proper disability diagnosis
'compromised the pupil's right to an appropriate education, seriously hampered the
parents' opportunity to participate in the formulation process, or caused a deprivation of
educational benefits."  *Id*. (*quoting Lathrop R-II Sch. Dist. v. Gray*, 611 F.3d at 424.)

> When, as here, accurate disability diagnoses would alert a district to
> the need for additional services, they are too important a factor to
> leave out if known.

(Decision at 41-42.)  With respect to the decision on the FAPE, the ALJ explained:

> While recognizing, as Parents' experts said, that the District's educators
> wanted the best for the Student, the facts in this case lead to the conclusion
> that Student was not provided a FAPE in large part because the District did
> not accurately identify his disabilities, did not review his progress as often
> as his lack of progress in a critical area warranted, and therefore did not
> revise his IEP to provide the level and intensity of services needed.  In
> addition, it did not consider providing services during vacation or other
> breaks and did not act timely to address the Student's lack of progress.  As
> a result, the District failed "to meet its substantive obligation under the
> IDEA [by offering] an IEP reasonably calculated to enable a child to make
> progress appropriate in *light of the child's circumstances.*"

(Decision at 44.)

The District argues that the ruling was factually unsupported and legally without

basis for several reasons.  The District argues that the IDEA does not require the

identification of a specific diagnosis or label and instead focuses on the identification of a

student's needs and addressing those needs.  The District maintains that the 2018

evaluation appropriately identified all of Student's needs, even if it did not use the label

"SLD"-specific learning disability—or his needs as dyslexia or ADHD.  For example, the

District points out that the 2018 evaluation identified Student's needs in reading,

mathematics, writing, speech and language, attention, social skills, and ASD-related

needs.  The evaluation also identified Student as having difficulty retaining skills and

performing them consistently and needs in all areas of reading, including phonics,

reading fluency, comprehension, decoding, word attack, oral reading and letter word

association. Further, the evaluation identified Student's difficulty in maintaining focus and attention. The District also argues that the ALJ erred in reviewing the evaluation in light of information provided in the 2019 IEE and, in effect, penalizing the District for meeting obligations arising from that IEE. In addition, the District argues that the IEE confirmed that the 2018 evaluation was appropriate because it identified Student's areas of need.

Parents maintain that the District's 2018 evaluation of Student was defective and that the District misclassified Student's diagnosis which in turn produced harm by impairing Student's educational progress. In particular, Parents contend that the District identified Student's disability as ASD, but that this identification did not account for Student's inability to read and write. Parents argue that this resulted in a failure to timely and appropriately identify Student as a student with dyslexia and ADHD requiring special education and related services, and that the failure to properly identify his specific disabilities and special educational needs caused the District to fail to provide a FAPE. Parents argue that this is not a case of "harmless misclassification," where a misclassification makes no difference because the student still received appropriate services, but instead the misclassification here made a substantial difference because the resulting educational programing harmed Student. Parents submit that the failure to identify and classify Student's disabilities hindered the proper design of Student's IEP— the proper identification being tied directly to Student's educational needs.

After a careful review of the Administrative Record, the Court affirms the findings of the ALJ with respect to the District's 2018 evaluation of Student and the finding that

the District failed to provide a FAPE to Student.  The record demonstrates that in the 2018 evaluation and the IEPs that followed, the District did not properly identify Student's most debilitating disabilities—dyslexia and ADHD.  At the same time, the record demonstrates Student persistently struggled with reading, and despite some slight progress in particular skills, Student remained below or near a first-grade reading level for years.  The Court acknowledges that the District made many efforts to address Student's various needs, but these efforts appear to be based largely on the Student's ASD.

The District's failure to accurately identify and classify Student's dyslexia and ADHD did not amount to a harmless misclassification.  Instead, the misclassification hindered the proper design of an IEP that would have met Student's reading needs.  This resulted in the District's failure to provide appropriate services to Student to ensure appropriate educational progress.  The record shows that over the course of several years, the District failed to identify numerous indicators that Student was not being properly served in the area of reading and despite years of very limited progress, the District did not respond with meaningful adjustments to Student's IEP.  For example, while the District adjusted goals and objectives for Student in reading, the adjustments were minimal and overall the goals remained substantially the same.  The overall picture shows that the District was not successful in teaching Student to read and write.  Indeed, the record shows that Student's reading skills remained very limited and that he made little progress through the end of third grade, despite average intellectual abilities and

progress in other areas.[12]  Based on this record, the District has not shown by a preponderance of the evidence that Student's IEPs were reasonably calculated to enable student to receive educational benefits.  The Court affirms the ALJ's determination that the District did not provide Student a FAPE.

In so holding, the Court acknowledges that the District is not required to maximize a student's progress and that the IDEA does not require grade level advancement to be meaningful.  The Court also recognizes that the parties dispute the amount of progress Student made in reading and that the measure of progress is made all the more difficult in this case because of Student's complex needs.  However, even recognizing these needs, the record shows that Student's inability to read and write was due mainly to his dyslexia.  And while Student did display limited progress in some specific reading skills, this progress was insufficient when broadly considered.  The District's failure to identify Student's dyslexia prevented the District from designing an appropriate remedy for his lack of learning progress and thereby deprived Student of educational benefits.

## IV.   Appropriate Relief

The Court agrees with the ALJ's determination with respect to appropriate services for Student.  In addition, the Court agrees with the ALJ's order with respect to compensatory education.  However, the Court's decision on the statute of limitations

---

[12]      Student made progress in math, handwriting, speech and language, and social skills.  However, Student's persistent struggle with reading highlights the District's failure to recognize and identify his particular disability associated with his reading deficit.

requires that the Court evaluate the ALJ's order regarding reimbursement.  In particular, reimbursable expenses occurring before August 8, 2017 are properly vacated.  It appears that the only reimbursable expenses that the ALJ found recoverable that may have occurred before August 8, 2017 are items 9, 10, 12, and 14 in Appendix A attached to the Decision.  However, because the dates of service are not entirely clear, the Court asks the parties to meet and confer in an effort to stipulate as to whether these fees are properly reimbursed in light of the Court's decision on the statute of limitations.  If an agreement cannot be reached, the parties should so inform the Court.

Finally, the District argues that the ALJ erred in ordering reimbursement of outside professionals hired by the Parents to complete the Student's IEE.  The District argues that, in effect, the ALJ ordered the District to pay for the Parents' expert witnesses because these professionals went beyond the 2018 evaluation and provided recommendations on the services that should be provided to Student.  Notably, the ALJ capped the IEE costs at $10,000, which represents the upper range of a typical IEE.  The Court agrees, as the ALJ concluded, that Parents are entitled to reimbursement for IEE fees because the District's 2018 evaluation was deficient under Minnesota law.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The District's Motion for Judgment on the Administrative Record (Doc. No. [16]) is **GRANTED IN PART** and **DENIED IN PART** as explained herein.

2.      Parents' Motion for Judgment on the Administrative Record (Doc.

No. [21]) is **GRANTED IN PART** and **DENIED IN PART** as explained herein.

3.      The ALJ's Decision is hereby **REVERSED** with respect to the ruling on

the statute of limitations, Parents' claims for actions before August 8, 2017 are dismissed

as untimely, and the Decision with respect to the remaining timely-filed claims under the

IDEA is **AFFIRMED**.

4.      The parties are to meet and confer to stipulate as to whether or not fees

listed in Appendix A (Doc. No. [1-2]) are properly reimbursed in light of the Court's

decision on the statute of limitations or inform the Court if an agreement cannot be

reached.

        **LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: March 1, 2021                    s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge